CABLEVISION SYSTEMS CORP., and CSC Holdings, LLC., Plaintiffs and Counter–Defendants,

v.

VERIZON NEW YORK INC., and GTE Wireless Incorporated, Defendants and Counter–Plaintiffs.

No. 15–CV–456 (GRB).

United States District Court, E.D. New York.

Signed Aug. 7, 2015.

---

Patterson Belknap Webb & Tyler by Saul Benjamin Shapiro, Travis Jason Tu, Jason Robert Vitullo, Robert W. Lehrburger, Jane Metcalf, New York, NY, for the Plaintiffs and Counter–Defendants.

Kirkland & Ellis LLP by Gregg F. LoCascio, Jonathan D. Brightbill, Michael A. Glick, Robert L. Folks, Tracie L. Bryant, Washington, D.C., for the Defendants and Counter–Plaintiffs.

### MEMORANDUM & ORDER

GARY R. BROWN, United States Magistrate Judge:

Cablevision Systems Corp. and Verizon New York, Inc., along with related entities (each group collectively referred to as "Cablevision" and "Verizon," respectively) represent two industry leaders in the provision of data services to consumers, including, as principally relevant herein, wireless access to the Internet, commonly referred to as "WiFi."[1] These organiza-

---

1. The terms "wireless" and "WiFi"—as applied to a computer connection that is not

tions have poured financial resources and technical ingenuity into their efforts, yielding innovative offerings to the public. To reap the rewards of these efforts, and in a spirit of vigorous competition, the parties have developed creative—and often highly amusing—marketing campaigns aimed at capturing public attention for their services.

In this action, Cablevision and Verizon each seek to enjoin certain advertisements produced by the other, claiming that those advertisements mislead the public or otherwise seek unfair advantage. Currently pending before the Court are cross-motions for preliminary injunctions. Cablevision's application largely focuses on Verizon's claims to offering the "Fastest WiFi Available from any provider," primarily based on the assertion that the WiFi routers offered by Verizon are not demonstrably faster than those offered by Cablevision. Verizon, for its part, chiefly challenges Cablevision's representations that it offers its customers 1.1 million WiFi hotspots, principally arguing that these ads are misleading because the overwhelming majority of those hotspots are located within customers' homes. Other challenges raised by Verizon include: (1) claims that Optimum WiFi offers a "better data network"; (2) a claim that Verizon "two-times" its customers by

charging separately for home Internet and cellular data service; and (3) statements relating to Cablevision's "Freewheel", a WiFi only device providing certain functions similar to those offered by cell-tower based "smartphone."

Because, as detailed herein, neither organization has met the demanding standards for the issuance of a preliminary injunction, both motions are denied.

## PROCEDURAL HISTORY

Plaintiffs Cablevision Systems Corp. and CSC Holdings, LLC commenced this action by filing a complaint against defendants Verizon Communications Inc., Verizon New York, Inc., and GTE Wireless Incorporated on January 29, 2015. Docket Entry ("DE") 1. On February 2, 2015, plaintiffs filed a motion for preliminary injunction. DE 11. At a conference before the Honorable Leonard D. Wexler, plaintiffs withdrew their motion for preliminary injunction, and the parties set forth a briefing/discovery schedule as to anticipated cross-motions for preliminary injunction, and a hearing date of May 28, 2015 for those motions. DE 20.

Plaintiffs filed an amended complaint against defendants on February 11, 2015.

hard-wired—appear to be synonymous. According to authoritative sources, "WiFi" was simply chosen as a marketing term by the wireless industry association because of its pronunciative similarity to the term "hi-fi." See, e.g., David Pogue, What WiFi Stands for—and Other Wireless Questions Answered, Sci. Am. (May 1, 2012), http://www.scientific american.com/article/pogue-what-wifi-stands-for-otherwireless-questions-answered/. Notably, both terms feature assonance, a rhyme produced through successive or proximate vowels. "Hi-fi," a term first employed by audiophiles, represented an acronym for "high fidelity," which initially referred to high-quality audio equipment, but during the

1950s, became a generic reference for phonographs. High Fidelity, Wikipedia, https://en. wikipedia.org/wiki/High_fidelity (last visited Aug. 4, 2015). Thus, when used in "hi-fi," "fi" stands for "fidelity," while the second syllable of "WiFi" is meaningless. Any confusion on this issue is certainly exacerbated by the WiFi Alliance's later adoption of the tagline "The Standard for Wireless Fidelity," which appeared on the Alliance's communications for a short time, but seems to have been a poorly crafted, post hoc justification of the term. Cory Doctorow, WiFi isn't short for "Wireless Fidelity," Boing Boing (Nov. 8, 2005, 5:43AM), http://boingboing.net/2005/11/08/wifi-isnt-short-for.html.

DE 21.[2] The next day, defendants filed a counterclaim and answer against all plaintiffs. DE 27. Plaintiffs answered defendants' counterclaim on March 5, 2015. DE 34.

On May 26, 2015, Judge Wexler referred the preliminary injunction hearing to the undersigned for a report and recommendation. DE 78. Each party then filed their respective motions for preliminary injunction on May 27, 2015. DE 84–88. On May 28, 2015, upon the parties' consent, Judge Wexler ordered that the case be reassigned to the undersigned to conduct all proceedings. DE 89.

The undersigned held a preliminary injunction hearing on May 28, 2015, June 4, 2015, and June 5, 2015. DE 90, 92, 94. On June 3, 2015, defendants filed an amended counterclaim and answer to the plaintiffs' First Amended Complaint. DE 92. On June 26, 2015, the Court "so ordered" a stipulation of dismissal against Verizon Communications Inc. Stipulation and Order dated June 26, 2015. On June 26, 2015, plaintiffs filed an answer to defendants' counterclaim to the First Amended Complaint, DE 105, and a Second Amended Complaint against defendants on the same date. DE 107. Defendants filed an answer and amended counterclaim to plaintiff's Second Amended Complaint on July 10, 2015. DE 114.

## FACTUAL BACKGROUND

### 1. Verizon's WiFi Offerings and Related Promotions

The primary product offering by Verizon at issue in the instant matter is Verizon FiOS ("FiOS"), tr. 27:20–24; 170:14–15, which describes Verizon's fiber optic network[3] carrying Internet, television, and telephone services to residences and small businesses. Tr. 170:16–21; 181:1–4. Verizon and Cablevision offer varying Internet "speed plans"—also known as "tiers"—to customers at different prices. Tr. 98:7–11; see also Tr. 170:24–171:6, 171:11–18, 251:25, 296:4–6, 426:13–23. Connection speed is commonly measured in scientific units known as megabits per second ("Mbps"), and can be calculated separately for upload and download speeds (meaning the speed at which data is sent to and received from the Internet). See, e.g., Tr. 120:3–22; 171:3–5; 479:2–11. Verizon FiOS offers five speed tiers (ranging from download/upload speeds of 25/25 Mbps to 500/500 Mbps) at a (monthly cost of $65 to nearly $300 per month). See Sealed Ex., DE 110. The evidence presented suggests that Verizon FiOS's top three tiers, namely 150/150 Mbps, 300/300 Mbps, and 500/500 Mbps, tr. 170:24–171:6, all provide faster download speeds than Cablevision's fastest plan, and all five FiOS plans offer faster upload speeds than any of Cablevision's offerings. Tr. 98:12–15, 120:6–122:8, 479:2–17. The parties have offered, in an exhibit filed under seal, the number of subscribers to each Verizon FiOS speed plan—examination of these figures reveals that a very small proportion of Verizon customers subscribe to the top three speed plans. Sealed Ex., DE 110.[4]

---

**2.** Plaintiffs' First Amended Complaint filed on February 11, 2015, DE 11, was redacted; plaintiffs subsequently filed a sealed version of the same First Amended Complaint on March 13, 2015. DE 42.

**3.** Throughout its filings, Verizon describes FiOS as a "100% fiber optic network." Because Cablevision has challenged this claim in this action—though not in connection with

these motions—the Court reaches no conclusions about this claim.

**4.** DE 110 contains a limited amount of highly-sensitive data about the number of subscribers to Verizon's speed tiers. While this Court's reliance on this data (albeit for a relatively minor point) gives rise to a presumption of access to this document, the law recognizes the need to protect information

The ability to deliver Internet speeds wirelessly is constrained by the speed of the router—an electronic device that transmits and receives data via radio signals to and from other WiFi enabled devices—supplied to or used by the customer. Tr. 65:2–66:5, 436:1. Verizon helpfully compared the router to the nozzle on the end of a garden hose—notwithstanding the capacity of the hose, it can only deliver the amount of water that can pass through the nozzle. Tr. 436:15–438:13. In 2014, a nonparty Internet Service Provider that competes with Verizon in another geographic area began advertising that it offered the "fastest in home WiFi," purportedly based upon the speed of its router. Tr. 174:20–175:7. In response, Verizon developed, and then offered to its customers (at an additional cost) the FiOS Quantum Gateway router, which can support "throughput" speeds up to the fastest FiOS tier (500/500Mbps). Tr. 174:20–175:18, 186:20–187:10, 221:24–225:4, 252:12. On or about January 18, 2015, following a speed test of its new router, Verizon began a campaign across television, digital, radio, print and direct marketing that FiOS provides the "fastest WiFi available from any provider." Tr. 171:23–172:1, 175:8–18, 243:1–3.

In a now-discontinued version of that advertising campaign, Verizon expressly predicated its "fastest WiFi" claim "on baseline maximum throughput speed results of 2014 Intertek router study." See, e.g., CSC Ex. 9, 11; Tr. 186:8–13; 186:20–187:2; 453:8–9. That router study tested the speed of FiOS's router against a number of other competitive devices offered by other Internet Service Providers and hardware manufacturers, but notably not including Cablevision's router. See CSC Ex. 1, at 7, Tr. 67:6–9. That test, though, focused solely on the speed of the routers transmitting WiFi data, but did not test the speed of the routers when connected to the Internet. See, e.g., CSC Ex. 1, Tr. 67:2–5; 71:4–9. Generally speaking, in that test, FiOS's router bested the other devices tested under most conditions, excluding, of course, Cablevision's router, which was not tested. CSC Ex. 1; Tr. 452:4–10. On its website, FiOS advertised the "fastest WiFi *router* available from any provider." CSC Ex. 11, at 1; Tr. 194:18–195:8. A subsequent router study by Intertek evaluated the FiOS router against Cablevision's router. CSC Ex. 2. In the second Intertek study, Verizon's router outperformed Cablevision on maximum throughput, though in certain instances by a narrow margin.[5] Tr. 68:20–25; Dx. QQ. One could conclude that the test found the routers—again when evaluated as stand-alone devices—were "comparable." CSC Ex. 2, at 47; Tr. 70:12–16; 88:22–89:4. Ultimately, however, comparative router speed, standing alone, would appear to be "a tale . : . full of sound and fury, signifying nothing."[6]

After receipt of the second Intertek study, Verizon continued to advertise its "Fastest WiFi" claim, with a change to the attribution. DX. AAA; Tr. 187:11–17; 188:5–10. Now, instead of basing the claim upon the Intertek study, Verizon premised its claim upon "Verizon's combi-

that could provide an advantage to commercial competitors. *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir.1995) ("Commercial competitors seeking an advantage over rivals need not be indulged in the name of monitoring the courts"). As such, this document will remain under seal.

5. Cablevision's router negligibly outperformed Verizon on average throughput. Tr. 456:1–20. Verizon's witness, Dr. Shoemake, testified that the "average throughput" used in the Intertek study was not a dependable measure. Tr. 456: 17–20.

6. William Shakespeare, *Macbeth*, Act. V, Scene V.

nation of the FiOS 500/500 Mbps Internet service tier with the FiOS Quantum Gateway router." DX AAA; Tr. 185:9–11, 188:5–10 (*citing* CSC Ex. 26). Verizon acknowledges that these changes were made as a result of Cablevision's filing of the instant lawsuit, and has agreed to permanently discontinue the original attribution. Tr. 240:21–242:23; *see also* Tr. 187:14–20. With these changes to the footnotes and captions in the ads, Verizon's "Fastest WiFi" campaign continued unabated. DX AAA; Tr. 236:19–237:4.

There is no dispute that, once its router is connected to its WiFi network, FiOS does offer a faster connection to the Internet than Cablevision, particularly when considering its more expensive speed plans. Tr. 120:6–8; 529:2–4; *see also id.* at 170:22–171:10, 171:19–22, 174:2–12, 184:11–185:1. At the same time, Cablevision offered expert opinion that WiFi speed, technically speaking "is the speed of that communication from a router to a device such as a laptop or tablet." CSC Proposed Findings ¶ 42, DE 103 (citing Tr. 60:20–61:3, 71:4–9); *see also* 60:12–15. To support this assertion, Cablevision points to non-Internet uses of WiFi, such as wireless printing or streaming video between two devices within a home. CSC Proposed Findings ¶ 44 (citing Tr. 72:4–14, 470:4–471:7, 283:8–24). Cablevision admits, as it must, that Internet connection is a common, if not preeminent, WiFi application. *Id.* at ¶ 43 (DX DD at 1). Cablevision concedes that "some consumers may at times use the term 'WiFi' as a 'shortcut' to refer not only to the WiFi connection itself, but also to a (wired) connection to the internet when accessed via WiFi." *Id.* at ¶ 45 (citing Tr. 71:18–25, 105:9–15, 109:2–3); *see also* Tr. 126:5–126:8.

Verizon, for its part, highlights numerous examples that suggest that consumers understand the term "WiFi," and by extension, the concept of WiFi speed, primarily, if not exclusively, in the context of a wireless connection to the Internet. *See, e.g.,* Tr. 182:7–17, 183:17–21, 358:24–359:5, 377:10–23. The evidence introduced includes Cablevision's own Frequently Asked Questions webpage,[7] and advertisements by Cablevision and other competitors.[8] Also, Verizon introduced an article published by CNET stating that "the term WiFi is often synonymous with access to the Internet. Most of us use 'WiFi' as a shortcut to mean our home broadband Internet connection." Tr. 125:16–126:2; DX KK at 2. Indeed, Verizon has shown that "WiFi" is commonly used to mean access to the Internet in a wireless fashion. Tr. 73:8–13, 127:7–10; DX DD; DX JJ; DX NN; DX PP.[9] Finally, while not necessarily dispositive, Verizon's video advertisements connected with the "Fastest WiFi" campaign highlight only WiFi applications that involve connection with the Internet. *See, e.g.,* CSC Ex. 9.

## 2. Cablevision's WiFi Network

Cablevision maintains and touts a network of "WiFi hotspots" which allow its

---

7. That page advises consumers that "WiFi is a technology that allows you to connect to the internet at broadband speeds without any wires." DX DD at 1.

8. Time Warner Cable, a New York Internet service competitor, states, "WiFi is a popular technology that allows devices such as computers, game consoles, cellphones, tablets and media players to wirelessly connect to the Internet." DX JJ at 1; *see also* Tr. 183:17–21.

9. *See also Internet Access in NYC*, NYCGO. COM, http://www.nycgo.com/articles/internet-access-in-nyc ("At some locations, you have to pay for WiFi. At others—like Starbucks and branches of the New York Public Library—you can surf the web for free.") (last visited Aug. 4, 2015).

customers to access the Internet wirelessly when away from home. *See, e.g.,* Tr. 289:17–290:22. Beginning in July 2014, Cablevision began promoting the fact that it offers subscribers access to a network of "1.1 million hotspots." CSC Proposed Findings ¶ 155 (citing CSC Ex. 53); DX G; DX H; Tr. 316:23. The nature of these hotspots are central to this dispute. Tr. 44:13–21, 557:1–10. Cablevision's network includes approximately 65,000 outdoor public routers, and about 100,000 routers located in small and medium businesses. Tr. 290:12–13. Most of the network, however, consists of roughly 1 million routers located in the homes of its residential customers. *Id.;* Tr. 336:2–6, 13–16. Each "smart" router installed by Cablevision includes a second channel—known as a "dual SSID"—which effectively provides a public access point for all its customers. Tr. 289:25–290:2. The Cablevision router consists of two networks, one available to the subscriber inside the home, the other a public network—made available to Optimum Online subscribers. Tr. 291:2–14. Thus, absent disabling this feature, each Cablevision customer is essentially hosting a public hotspot.[10] Tr. 291:8–14; 303:10–304:2. Evidence at the hearing demonstrated that the routers used by Cablevision provide WiFi service at distances of 135' or more. DX QQ; CSC Ex. 38 at Ex. 3, Tables 1.0, 1.1, 2.0; Tr. 83:5–84:6; *see also* Tr. 464:8.

Verizon challenges several claims that Cablevision makes with respect to its wireless network. *See, e.g.,* Tr. 28:15–16, 298:2–6; *see also id.* at 22:18–20, 210:4–12. Principally, Verizon contends that Cablevision's advertising touting its 1.1 million hotspots misleads consumers because approximately 1 million of those hotspots emanate from routers in the private homes of its subscribers. Tr. 341:11–16; 342:13–16; *see also* Tr. 44:13–21; 557:1–10. Hence, Verizon argues, these hotspots are not truly "public." Tr. 192:20–24; 193:6–12; 194:6–10. Additionally, Verizon points to numerous Cablevision ads that could be construed to suggest through omission, that these hotspots are located exclusively in public places. DX F, G, H, OO (television commercial discussing hotspots in public locations).[11]

Closely related to the WiFi network issue are advertisements by Cablevision touting that it offers a "better data network" than Verizon, *see* DX E, DX M, DX N; tr. 198:18–199:8, 397:21–24, and suggestions that Verizon "two-times" it customers by charging for cellular data usage from customers that have already paid for WiFi access at home. *See* DX L; Tr. 308:12309:10. As to the former, it is undisputed that when connected to WiFi, mobile computer devices can access greater quanta of data far faster than when connected via cellular towers. Tr. 256:8–10. At the same time, it is also well beyond dispute that Verizon's cellular towers pro-

---

10. The testimony revealed that this technique provided an economical way for Cablevision to dramatically expand its WiFi network, as dedicated outdoor public hotspots cost thousands of dollars each, while the provision of a smart router to a customer costs under $100. Tr. 336:20–337:9

11. Notably, at the time of the hearing, Cablevision's website included an incorrect formulation of this statement indicating that it maintained hotspots at "1 million public locations like train stations, restaurants, cafes and parks." *See* DX OO. Clearly such a statement would be misleading because the residential hotspots are not sited *in* public locations, even if, as discussed herein, they may be accessible *from* public locations. Following a conference with the Court, Cablevision has agreed to discontinue making this claim, absent a change of circumstances, which change would presumably involve the construction of 900,000 or so hotspots in public locations.

vide far broader geographic coverage than Cablevision's WiFi network, though there are undoubtedly places in which a customer could access WiFi while being unable to access cell towers. Tr. 400:10–12. As to the latter contention, Verizon does impose separate data charges on its customers, under certain circumstances, for data obtained via cellular towers. *See* Tr. 205:3–15.

### 3. The Freewheel Device

In recent months, Cablevision launched a new product known as Freewheel, an all-WiFi communication device. CSC Ex. 43; Tr. 307:7–9. Freewheel consists of a Motorola Moto–G model smartphone configured to function only using WiFi connections rather than traditional cellular telephone towers. CSC Ex. 43; Tr. 316:18–317:9. Using this configuration enables Cablevision to offer consumers a relatively low-cost mobile device that can be used, where WiFi is available, to make and receive phone calls, text and surf the Internet. *Id.;* Tr. 317:1–4. Verizon objects to many aspects of the Freewheel advertising, including references to the device as a "phone," and comparisons drawn to cell phones and smartphones. *See, e.g.,* Verizon Findings ¶ 22, DE 102 (citing Tr. 397:1–3); Tr. 403:17–19. Verizon does not offer any survey evidence on the issue of consumer confusion, but points to internal Cablevision marketing research—focus group studies of preliminary Freewheel advertisements—suggesting that certain viewers could be confused about the nature of the Freewheel device and the extent of the "coverage" of the WiFi network which allows the device to be online. DX B; Tr. 395:13–16.

For its part, Cablevision defends the marketing campaign, suggesting that Freewheel does, in fact, function as a smartphone when connected to WiFi, and identifies limiting language in the ads designed to inform consumers about the device. *See* Tr. 323:4–9, 323:15–19, 324:2–8, 530:9–18. While each side tries to focus the dispute on discrete wording in the campaign, the *gestalt* is best gathered from viewing excerpts from the web site advertisement, which are reproduced below:

# Goodbye data limits.
# Hello Generation WiFi.

📞 Call us today

The all-WiFi
Freewheel
experience.

happens over WiFi

**Meet the world's first Freewheel device.**

The Motorola moto g. Exceptional phone. Exceptional price.

Tap into the Freewheel Experience with style and speed

The Motorola moto g has the champion's display and a full day battery, quad-core speed, Android 4.4 KitKat, and a host of other features you'd expect from a phone that will transport you to the new, connected world of mobile communications.

**$99.95**

Optimized for Freewheel

Automatically connects you to the strongest Optimum WiFi hotspot near you, switching seamlessly as you go about your day.

Add any locked WiFi hotspot you have access to. Just enter the password once, and you're good to go.

DX N. Using this "picture is worth a thousand words" approach, it seems clear that Cablevision has positioned its Freewheel product as something new and different from a cellular phone.

## DISCUSSION

### 1. The Standard of Review

A party seeking preliminary injunctive relief must demonstrate

(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction.

*Red Earth LLC v. United States,* 657 F.3d 138, 143 (2d Cir.2011) (internal quotation marks omitted). The Court has "wide discretion in determining whether to grant a preliminary injunction," as it is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor,* 481 F.3d 60, 66 (2d Cir.2007) (citations omitted). In *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 (2d Cir.2007) ("*DIRECTV*"), a case which bears great factual similarity to the instant dispute, the Second Circuit noted: "the district judge's determination of the meaning of the advertisement [is] a finding of fact that shall not be set aside unless clearly erroneous." *Id.* (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 237 (2d Cir.2001), and citing *Johnson & Johnson v. GAC Int'l, Inc.,* 862 F.2d 975, 979 (2d Cir.1988)).

*DIRECTV* involved false advertising claims by Time Warner Cable against DIRECTV relating to the television picture quality provided by the two entities, in particular, the quality improvement purportedly offered by DIRECTV's digital HDTV broadcasts. The Second Circuit set forth the theories available to a plaintiff in a false advertising action under § 43(a) of the Lanham Act:

Two different theories of recovery are available to a plaintiff who brings a false advertising action under § 43(a) of the Lanham Act. First, the plaintiff can demonstrate that the challenged advertisement is literally false, *i.e.*, false on its face. *See GAC Int'l, Inc.*, 862 F.2d at 977. When an advertisement is shown to be literally or facially false, consumer deception is presumed, and "the court may grant relief without reference to the advertisement's [actual] impact on the buying public." *Coca–Cola Co. [v. Tropicana Prods., Inc.]*, 690 F.2d [312] at 317 [ (2d Cir.1982) ]. "This is because plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir.1999). Alternatively, a plaintiff can show that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers. *See Coca–Cola Co.*, 690 F.2d at 317. "[P]laintiffs alleging an implied falsehood are claiming that a statement, whatever its literal truth, has left an impression on the listener [or viewer] that conflicts with reality"—a claim that "invites a comparison of the impression, rather than the statement, with the truth." *Schering Corp.*, 189 F.3d at 229. Therefore, whereas "plaintiffs seeking to establish a literal falsehood must generally show the substance of what is conveyed, ... a district court must rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message." *Id.* *DIRECTV*, 497 F.3d at 153.

Importantly, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir.2009) (citation omitted). "Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 343 (S.D.N.Y.2010) (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir.1985)).

## 2. Cablevision Claims

### A. Verizon's Fastest WiFi Ads

 Cablevision's challenge to the Verizon FiOS "Fastest WiFi" ads proves unpersuasive. As a factual matter, Cablevision does not dispute, and the evidence clearly establishes, that Verizon FiOS's speed plans allow customers to wirelessly connect to the Internet at speeds far in excess of those offered by Cablevision. Tr. 120:6–8, 529:2–4, 170:22–171:10, 171:19–22, 174:2–12, 184:11–185:1; CSC Ex. 2 at 47; Tr. 70:12–16, 88:22–89:4.

Rather than challenge the claim directly, Cablevision premises its contention on credible evidence suggesting that, as a technical matter, WiFi speed relates to the performance speed of a router rather than the actual speed at which consumers can connect to the Internet. However, persuasive evidence of record—including Cablevision's own documents—clearly demonstrates that in common parlance, consumers understand WiFi to refer to a wireless connection to the Internet. Tr. 73:8–13; 127:7–10; DX DD; DX JJ; DX NN; DX PP; *see also Internet Access in NYC, NYCGO.COM*, http://www.nycgo.com/articles/internet-access-in-nyc (last visited Aug. 4, 2015). Thus, having the "fastest WiFi" would commonly be inter-

preted to refer to the speed of a wireless Internet connection. Logic dictates a similar conclusion: consumers paying for WiFi are likely to be more concerned with the speed provided by their Internet Service Provider, which permits them to download music, movies, games and the like, rather than the theoretical capability of the supplied router under laboratory conditions. Tr. 109:16–20; 181:18–21.

Therefore, based on the evidence offered at the hearing, this Court cannot conclude that Cablevision will likely succeed or offer a serious question going to the merits of whether Verizon's ad represents a literal falsehood. On the question of implied falsity, the Verizon ads do not, in any manner, rely upon "use of innuendo, indirect intimations, and ambiguous suggestions," and the doctrine seems inopposite. *DIRECTV*, 497 F.3d at 156. Moreover, Cablevision does not offer any evidence of consumer reaction to the Verizon ads that might support this theory, which is generally required to support such a claim. *Id.*

Relying on the Third Circuit's decision in *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, Cablevision argues that Verizon's earlier predication of the "Fastest WiFi" claim solely upon the Intertek study of router speed prevents the company from changing its subsequent advertisement. 774 F.3d 192 (3d Cir.2014). In *Groupe SEB*, the defendant advertised its steam iron in packaging hawking the fact that the product offered "More Powerful Steam … at half the price," explicitly defining the phrase to refer to "grams per minute" produced by the device. In the course of litigation—having never changed its packaging—defendant urged the Court to deem the term ambiguous based upon consumer surveys. The Third Circuit rejected this efforts, noting "Euro—Pro chose a definition for steam power and now must live with it." *Id.* at 202. Ca-

blevision attempts to shoehorn this determination into a doctrine that suggests that Verizon, having first advertised an erroneous measure of WiFi speed is forever forbidden from altering it. Tr. 16:1–9.

This would appear to be an overly broad reading of the case, and makes no sense here. Rather, Verizon's commitment to discontinue the erroneous statement that it has the fastest WiFi based solely upon the router speed study renders the question of preliminary relief as to those ads moot. *Stokely–Van Camp, Inc. v. Coca–Cola Co.*, 646 F.Supp.2d 510, 524–25 (S.D.N.Y.2009) ("Coca—Cola's cessation of the ads and its commitment not to run such ads during the pendency of this lawsuit obviates the need for a preliminary injunction on these issues because SVC cannot show any likelihood of irreparable injury without the preliminary injunction"). And given that the Court finds that Cablevision cannot demonstrate a likelihood of success on the question of whether the "Fastest WiFi" claim is literally or implicitly false, preliminary relief is unwarranted.

Based on these findings, Cablevision's application for a preliminary injunction is denied.

### 3. Verizon's Claims

#### A. Timeliness of Verizon's Challenges to Cablevision's Advertisements

■ As a threshold matter, Cablevision argues that Verizon's motion should be denied because of unreasonable delay in seeking preliminary injunctive relief as to most of its promotions. The Second Circuit has held that "[a] district court should generally consider delay in assessing irreparable harm." *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir.1995); *Kuklachev v. Gelfman*, 629 F.Supp.2d 236, 250 (E.D.N.Y. 2008), *aff'd*, 361 Fed.Appx. 161 (2d Cir.

2009) ("Delay generally destroys the presumption of irreparable harm that follows a showing of likelihood of confusion in a trademark case")(collecting cases). As the undersigned has held elsewhere, there is no "bright-line rule for assessing inordinate delay in connection with an application for a preliminary injunction." *Vox Amplification Ltd. v. Meussdorffer*, No. CV 13–4922 ADS GRB, 2014 WL 558866, at \*16 (E.D.N.Y. Feb. 11, 2014) *report and recommendation adopted*, 50 F.Supp.3d 355 (E.D.N.Y.2014).

As an initial matter, I find that Verizon's inordinate delay in seeking relief in connection with all but the Freewheel ads weighs heavily against a finding of irreparable harm as to those ads. Although Verizon's counsel points to the lack of a bright-line rule in assessing delay, tr. 556:1–25, he failed to articulate any reason why Verizon waited more than six months before bringing claims against the "1.1 million hot spots" ads.[12] Tr. 529:18–19; 556:12. Furthermore, because I find, as discussed below, that Verizon has failed to meet its demonstration of likelihood of success as to those campaigns, preliminary relief is undoubtedly unwarranted.

### B. Cablevision's WiFi Network Promotions

■ Verizon challenges the veracity of Cablevision's claims of offering subscribers access to a network of 1.1 million WiFi hotspots. Tr. 28:15–16; 298:2–6. Even assuming that the challenge is not time-barred, it still fails. It is true, as Verizon

suggests, that review of Cablevision's advertisements reveal that it studiously avoids any mention of the fact that most of these hotspots consist of routers located in the homes of residential customers, while, at the same time, emphasizing those hotspots located in public facilities.[13] *See, e.g.*, DX F, G, H, OO. Verizon argues that these advertisements are literally—or at least implicitly—false, based on the failure to disclose that 87% of the hotspots emanate from residential locations. Tr. 290:12–13, 336:1–6, 15–16.

During the hearing, Cablevision provided credible expert evidence demonstrating that Cablevision's dual-SSID routers provide WiFi connection at distances of 135' or more, DX QQ; CSC Ex. 38 at Ex. 3, Tables 1.0, 1.1, 2.0; Tr. 83:5–84:6, and Verizon's expert testified that consumers could use the devices at such distances. Tr. 464:8. The Intertek router studies commissioned by Verizon tested routers at distances of 101' and 135', noting that these locations "were outside the home." CSC Ex. 1 & 2 at 15. As many single-family homes in this district are located on plots of one-quarter acre (measuring approximately 100 feet square), or sometimes less, signals from residential routers can be accessed from the street or sidewalk. Tr. 83. Courts have construed streets and sidewalks as "public facilities" in any number of contexts. *See, e.g., Hill v. Colorado*, 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (describing "public sidewalks, streets, and ways" as " 'quintes-

---

**12.** Verizon argues that when considered in tandem with the recent Freewheel campaign, the older WiFi hotspot and network ads take on a different dimension. However, I find this argument unpersuasive. The Freewheel ads can be considered on a stand-alone basis, and are in no way exacerbated by the WiFi network ads.

**13.** Other providers have experienced difficulties as a result of dual-SSID routers. *See Grear v. Comcast Corp.*, No. C 14–05333(JSW), 2015 WL 926576 at \*1 (N.D.Cal. Mar. 3, 2015) (class action by Comcast customers "premised on the theory that Comcast did not obtain their authorization to use their wireless router to broadcast these additional 'hotspots' to the public.")

sential' public forums for free speech"); *California v. Ciraolo*, 476 U.S. 207, 224, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ("Comings and goings on public streets are public matters, and the Constitution does not disable police from observing what every member of the public can see"); *Frame v. City of Arlington*, 657 F.3d 215, 227 (5th Cir.2011) (holding sidewalks subject to the ADA). I see no reason to take a more narrow view of the concept of "public" when evaluating the veracity of Cablevision's promotions and, as such, I find that Cablevision's advertisements touting 1.1 million hotspots are neither expressly nor implicitly false.

■ As to the "better data network" ads, Verizon contends that "Cablevision's claim that the Optimum WiFi Network is a 'better data network' is literally false as Verizon has better, more expansive geographic data coverage." Verizon Proposed Findings ¶ 51. However, I cannot conclude that, in this context, "better" necessarily relates to geographic coverage. It is beyond dispute, for example, that a consumer connected to WiFi will experience faster downloads than when connected through cellular towers, such that some users could consider Cablevision's WiFi offering "better" than Verizon's more available cellular network which features narrower bandwidth. Tr. 256:8–10.

That the meaning of "better" can be questioned not only undermines any claim of falsity, but renders this language inactionable puffery. In *DIRECTV*, the Second Circuit quoted the Third Circuit in defining puffery:

> Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language. 'Such sales talk, or puffing, as it is commonly called, is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer.... The 'puffing' rule amounts to a seller's privilege to lie his head off, so long as he says nothing specific.'

*DIRECTV*, 497 F.3d at 159. In *Lipton v. Nature Co.*, the Court of Appeals determined that the "general assertion that the research ... conducted was 'thorough' is mere 'puffing' and therefore, not actionable." 71 F.3d 464, 474 (2d Cir.1995). Given these authorities, to say that one's product is "better" than a competitive product, without more specificity, could well define the concept of puffery.[14]

### C. The Freewheel Device

■ Verizon contends that, to the extent that Cablevision refers to its Freewheel device as a "phone" or "smartphone," rather than as a "device," such references represent a literal falsehood. This argument is misplaced. As the evidence clearly demonstrates, the Freewheel actually is a "Motorola Moto–G model smartphone."[15] Ex. 43; Lake Tr. 316:18–317:9. One popular review site describes this unit as "a graciously designed phone," Jessica Dolcourt, *Motorola Moto G Review*, CNET (Sept. 17, 2014), http://www.

---

14. In the 2003 film *Elf*, Buddy the Elf (played by comedian Will Ferrell) excitedly dashes into a coffee shop upon observing a neon sign boasting the "World's Best Cup of Coffee" displayed in the shop's window. Buddy's ebullient congratulations to the deadpan counter staff is funny precisely because—as the audience well knows—consumers usually recognize such hyperbole as puffery.

15. Interestingly, Motorola was responsible for the introduction of "the world's first commercial handheld cellular phone [which] received approval from the U.S. Federal Communications Commission on September 21, 1983." http://www.motorola.com/us/consumers/about-motorola-us/About—Motorola–History–Timeline/About—MotorolaHistory–Timeline.html

cnet.com/products/motorola-moto-g-review, and the manufacturer touts it as "a great smartphone." Moto G, http://www.motorola.com/us/smartphones/moto–g-2nd–gen/moto–g–2nd–gen.html (last visited Aug. 4, 2015). That Cablevision configures the Moto G to function only when connected to WiFi rather than using cell phone towers does not change its essence as a telephone—just as the word "phone" can be equally applied to cell phones, historical landline telephones or cordless handsets.[16] Analogously, an automobile powered by an electrical or a hybrid engine is no less a "car" than a standard gasoline-powered vehicle. Thus, simply calling the Freewheel a "phone" or even a "smartphone" does not constitute a literal falsehood.

■ Verizon's principal contention, though, emanates from the concern that consumers will confuse the service offered with the Freewheel with cellular telephone service,[17] and hence, Verizon will lose customers and suffer irreparable harm.[18] Thus, the true claim is an implied falsehood claim. Here, the problem is one of proof: in evaluating such a claim, " 'a district court *must* rely on extrinsic evidence [of consumer deception or confusion] to support a finding of an implicitly false message.' " *DIRECTV*, 497 F.3d at 153 (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir.1999) (emphasis in the original)).

The only consumer perception evidence offered at this juncture involves Cablevision's own focus group studies of preliminary versions of Freewheel advertisements. To be clear, that focus group evidence did suggest the possibility of consumer confusion: the company conducting the work for Cablevision warned that "[c]omparisons to cellular in messaging exposed during the groups helped create the perception that Freewheel service (including talk/text) will be ubiquitous given respondents' near universal coverage experience with cell service for talk/text/data[.]" DX A at 6; *see also* DX B at 3.

Cablevision argues that the Court cannot rely on focus group research as such information is "inherently unreliable for determining the message communicated by advertising, because they are qualitative rather than quantitative," CSC Proposed Findings ¶ 227 (citing *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 277 (4th Cir. 2002)). Though *Scotts* held focus groups insufficient under *Daubert* to support a claim in that case, the matter is readily distinguishable. The Fourth Circuit found that "the moderators of the groups channeled the discussions and led the participants into giving responses favorable to Scotts," and such procedures "destroyed the objectivity of the discussions, render-

---

16. One dictionary defines "telephone" as "an instrument for reproducing sounds at a distance; *specifically:* one in which sound is converted into electrical impulses for transmission (as by wire or radio waves)." Telephone, Merriam Webster, http://www.merriam-webster.com/dictionary/telephone (last visited Aug. 4, 2015).

17. Verizon's complaint about Cablevision's promotional language suggesting that the Freewheel service is "better than cellular," Verizon Proposed Findings at ¶ 22, falls squarely within the discussions of puffery, *supra.*

18. Cablevision challenges the notion of irreparable harm in the cellular telephone market because, unlike the provision of wireless Internet access (essentially a binary marketplace), "the mobile phone market—unlike the internet service provider market—contains many competitors besides Verizon and Cablevision." CSC Proposed Findings ¶ 241 (citing Tr. 326:18–20). Verizon takes issue with this concept. Verizon Proposed Findings ¶¶ 68–74. However, because I find the Freewheel challenge fails on its merits, this opinion does not reach the issue of irreparable harm as to cellular telephone service.

ing the results utterly unreliable." *Id.* at 277–8. Indeed, the Fourth Circuit expressly did not "decide the broader question of the general admissibility of focus group evidence." *Id.* And I need not do so here.

In this matter, the evidence clearly shows that the focus groups were shown preliminary drafts of Freewheel advertisements, and that substantial changes were made to the promotions before release. *See* Tr. 323:4–19. The changes include specific qualifications of the text to make clear that "it's a WiFi phone" rather than a "cell phone," as demonstrated by Exhibit 44:

CSC Ex. 44 (emphasis added). Another post-focus group change made to the promotional material included this page of the website (and significantly, Freewheel could, at that time only be purchased from the website), which further clarifies the nature of the device:

*Id.* Thus, because of these substantial changes to the promotion made after the focus group review, I find that that focus

group evidence is not a reliable indicator of consumer perception at this juncture. Thus, Verizon has provided no extrinsic evidence of consumer confusion, and hence, cannot satisfy its burden of likely success on the merits or even a substantial issue going to the merits.[19]

Based on these findings, Verizon's motion for a preliminary injunction based on the Freewheel promotion must be denied.

## CONCLUSION

For the reasons set forth herein, plaintiffs' and defendants' cross-motions for preliminary injunction are DENIED.

---

19. Even if such evidence were considered, examination of such ads, as discussed above, clearly denote that Freewheel is clearly some-thing other than cell-tower based cellphones. See DX N.